## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSHUA OSTEEN and SYSTEMSLYNK, LLC, individually and as a member for UPLYNKD, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> JARED YELLIN, CILA LABS, LLC, a Delaware limited liability company, CILA INCUBATOR PRIVATE LIMITED, and PROJECT 10K, LLC (f/k/a 10X INCUBATOR, LLC), a Delaware limited liability company, 10X TECH ANGELS, LLC, a Delaware limited liability company, <br><br> Defendants. | DOCKET NO: |

Joshua Osteen and SystemsLynk, LLC ("SystemsLynk, LLC"), individually and as member of Uplynkd, LLC ("Plaintiff"), by way of Complaint allege against the above-named Defendants the following:

## **INTRODUCTION**

1.      This case involves a shameful and outrageous fraud, blatant breaches of fiduciary duty, numerous breaches of contract, and other tortious misconduct on the part of Defendants against Plaintiffs, and especially Mr. Osteen, a hardworking "blue collar" professional that had was duped into working with Defendants to develop and bring to market his idea for a software that would optimize the way public adjustment claims were processed.

1

2.      Mr. Osteen had worked in a sector of the property and casualty claims adjustment industry for over a decade and had labored arduously to have his software idea ready for development.

3.      Mr. Osteen had prepared over 400 pages worth of documents pertaining to the mechanics and functions of the software, and began searching to find the right developer that would help him develop the software.

4.      His search would lead to meeting Defendant Yellin, which would begin a two-year nightmare that would result in, among other things, Mr. Osteen's reputation and credibility being damaged; losing market opportunity to competitors that were not present when he began his journey; and losing over $150,000 of capital, $100,000.00 of which he himself had contributed in order to develop his software, and $50,000 originated from a nonparty individual, and fees and costs accumulated over the costs of the purported development of the project. .

5.      During Mr. Osteen's initial encounters with Defendants, Defendant Yellin would make various statements – which, Mr. Osteen later learned were lies and misrepresentations – as means of inducing Mr. Osteen to work with Defendant Yellin's company, Defendant CILA Labs, and, later, Defendant CILA Private Incubator.

6.      Defendant Yellin's pursuit of Mr. Osteen would be accompanied by emotionalized stories of how he started Defendant CILA Labs to help people avoid the awful experiences that flow from developing a product.

7.      Defendant Yellin would assure Mr. Osteen that he would develop his product in **90-120 days** and at a lower cost than his competitors.

2

8.      Defendant Yellin's promises, and assurances, induced Mr. Osteen into entering a series of agreements with Defendants.

9.      It has been over two years since the first of Defendant Yellin's fraudulent representations. Mr. Osteen had provided to Defendants $100,000.00 plus an additional $50,000 originated  from a nonparty individual , and Defendants are still nowhere near developing a fully functional software – let alone being capable of doing the things that they promised they would – and Defendants respond to this is they cannot (or will not) do what they promised they would.

10.     Unfortunately for Mr. Osteen, he did not know that his situation was not unique. Over a dozen people just like Mr. Osteen have the same or similar story. Some of which refuse to let Defendants bully them into submission. *See Werney vs. Yellin et al.*, Docket No.: 2:22-cv-05417 currently pending in the United States District Court of New Jersey; *Ghafoor vs. Yellin, et al.*, Docket No.: 2:22-cv-04375 currently pending in the United States District Court of New Jersey; *Dill, et al., v. Yellin, et al.*, Docket No.: 22-CV-06116, currently pending in the United States District Court of New Jersey.

11.     Like these other co-founders, Mr. Osteen feels betrayed and lied to continuously by Defendant Yellin and the agents of the Defendants (among others). The delays caused and opportunities lost – for which Defendants have no explanation except to deny, deflect and delay – are incalculable. Mr. Osteen's reputation has been damaged.  Mr. Osteen's faith in Defendants' ability to deliver on their promises is justifiably gone.

12.     Defendant Yellin caused Mr. Osteen to fall victim to his schemes and the Defendants have benefited substantially from this misconduct. Mr. Osteen seeks to rectify the harm inflicted on him by Defendants and seek to be made whole.

## PARTIES

13.    Plaintiff JOSHUA OSTEEN is an individual and a resident of Montgomery Texas.

14.    Plaintiff SYSTEMSLYNK, LLC is a limited liability company organized under the laws of the State of Florida.

15.    Defendant JARED YELLIN is an individual with numerous homes who, upon information and belief, is a resident of the state of Florida.

16.    Defendant CILA LABS, LLC is a Delaware Limited Liability Company with a principal place of business, upon information and belief, at 18 Hook Mountain Road, Suite 202, Pine Brook, New Jersey 07058.

17.    Defendant CILA INCUBATOR PRIVATE LIMITED is company organized under the laws of India, with a registered office in Bangalore, India. Upon information and belief, Defendant Jared Yellin is an owner of Defendant CILA INCUBATOR PRIVATE LIMITED.

18.    Defendant PROJECT 10K, LLC f/k/a 10X INCUBATOR, LLC is a Delaware Limited Liability Company with its headquarters in the State of Florida.

19.    Defendant 10X TECH ANGELS, LLC is a Delaware Limited Liability Company with its headquarters in the State of Florida.

## JURISDICTION AND VENUE

20.    Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332.

21.    Plaintiff JOSHUA OSTEEN ("Mr. Osteen") is a citizen and resident of the State of Texas.

22.    Plaintiff SYSTEMSLYNK, LLC ("Systemslynk") has one member, Joshua Osteen, who is a citizen and resident of the State of Texas.

23.     Defendant Jared Yellin is a citizen and resides in the State of Florida.

24.     Defendant CILA Labs, LLC ("CILA Labs"), is a citizen of the State of Delaware, and for all of the relevant times herein, has had offices in the State of New Jersey.

25.     Upon information, belief, and a reasonable search no Member of Defendant CILA Labs is a resident of Texas.

26.     Defendant CILA Incubator Private Limited ("CILA India") is a resident of the Nation of India.

27.     Upon information, belief, and a reasonable search, no Member of Defendant CILA India is a resident of Texas.

28.     Defendant PROJECT 10K, LLC f/k/a 10X INCUBATOR, LLC ("Project 10K" or "10X Incubator") is a Delaware Limited Liability Company with its headquarters in the State of Florida.

29.     Upon information, belief, and a reasonable search no Member of Defendant Project 10K is a resident of Texas.

30.     Defendant 10X TECH ANGELS, LLC ("10X TECH") is a Delaware Limited Liability Company with its headquarters in the State of Florida.

31.     Upon information, belief, and a reasonable search no Member of Defendant 10X Tech is a resident of Texas.

32.     Complete diversity exists among the parties. The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

33.     Venue in the District of New Jersey is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions on which the claims asserted herein are based in this State and in this District.

## FACTS

## PLAINTIFF'S BACKGROUND

34.     Joshua Osteen is a professional services provider with over a decade of experience in the industry of property and casualty claims adjustments.

35.     Before Mr. Osteen had the misfortune of meeting Defendants, he had an idea that would revolutionize the processing of public adjustment claims. This idea was a Software as a Service ("SaaS") that would eventually be called – ClaimsLynk d/b/a ClaimGuru.

36.     Specifically, the software was for a claims management system for the public insurance adjusting industry that sought to revolutionize the industry by optimizing the way such claims are processed.

## DEFENDANT YELLIN INDUCES MR. OSTEEN

37.     On or about July 20, 2020, Mr. Osteen participated in a Zoom meeting with Defendant Yellin after being introduced to Defendant Yellin through mutual friends, Esteban (Stevie) and Alethia Gallegos.

38.     During the conversation, Defendant Yellin introduced himself as a "nontech, tech founder" and lauded his track record of successfully building and launching tech companies.

39.     In an attempt to convince Mr. Osteen to enter into a partnership with him, Defendant Yellin represented to Mr. Osteen that he had a development company based in India that was founded after an extensive process, that he possessed a large staff of developers that would be dedicated to Mr. Osteen's project, that he would be able to develop Mr. Osteen's software faster than other developers and that it would be "legitimately **at cost**."

6

40.    Mr. Osteen expressed to Defendant Yellin that he was not interested in a partnership because he was not looking for a partner.

41.    However, Defendant Yellin persisted and inquired whether Mr. Osteen would be willing to entertain entering into a partnership if a partner brought the necessary resources to the table to get Mr. Osteen's project developed fast and at low cost.

42.    Defendants were aware that Mr. Osteen had previously received quotes from other developers.  (*See* attached as "Exhibit A, July 18, 2020 Notes of Katie Vold Monasmith at 2 ("Pl. Ex. A")).

43.    Defendants were aware that Mr. Osteen had previously received one quote to develop his software for $450,000.00 and another quote to develop his software for $120,000.00 plus $2,500.00 per month. (*Id*.).

44.    After hearing Defendant Yellin's representations about his large development team, purported track record of success, that he would be able to develop the software at lower cost, and was a "go to market" solution, Mr. Osteen agreed to continue the conversation with Defendant Yellin but reiterated that he was not interested in a partnership.

45.    Mr. Osteen and Defendants agreed to schedule another meeting to discuss the capabilities of Defendants to develop Mr. Osteen's software.

46.    Prior to the next meeting, Mr. Osteen and Defendants entered into a non-disclosure agreement ("NDA") so that would Mr. Osteen could present his software engineering documents to Defendants for review.

47.    Following the Defendants and Mr. Osteen entering into an NDA, Mr. Osteen presented to Defendants approximately four-hundred pages of documents detailing the software that Mr. Osteen wished to develop, and the outline of the project to Defendant

7

Yellin and another employee of Defendants, Mani Soundararajan, who upon information and belief is a co-owner of Defendants CILA Labs and CILA India, as well as the Chief Technology Officer ("CTO") of CILA Labs.

48.     The Defendants purportedly reviewed the documents pertaining to the software that Mr. Osteen sought to develop. Upon information and belief, this purported review took approximately one week.

49.     After reviewing the documents presented by Mr. Osteen, Defendant Yellin represented to Mr. Osteen that he would be able to have the software developed "at cost" and that the costs of developing this website with Defendants would be lower than if he hired  one of the other development companies.

50.     Yellin explained that his ability to do this was because he had founded an India-based company, which purportedly was difficult to do from the United States, and he had hired a large staff of developers that would allow some to be dedicated solely to the development of the software..

51.     Mr. Osteen again advised Defendant Yellin that he had already received quotes from other companies and provided those quotes to Defendant Yellin.

52.     One of the quotes provided to Defendant Yellin was for $96,360.00 and the duration for developing the website would take approximately 19 weeks.

53.     Defendant Yellin continued to entice Mr. Osteen to enter into a partnership with Defendants through an emotionalized story about his purported awful experience with a development company that underquoted him on the amount of money and time it would take to develop Synduit and that to have others avoid this dreadful experience he founded CILA.

8

54.     Defendant Yellin pressed with representations about how his team would develop the software and would be able to have a minimum viable product ("MPV") within 90-120 days to start generating revenues.

55.     Defendant Yellin stated to Mr. Osteen that in order for him to be able to develop the software, however, Mr. Osteen needed to provide a capital infusion of $100,000.00, and Defendants would also need 40% partnership equity.

56.     The parties agreed that Mr. Osteen's software would be completely developed for $100,000.00, and that the MVP would be launched within 90-120 days to start generating revenue.

**DEFENDANT YELLIN'S FRAUDULENT INDUCEMENT OF MR. OSTEEN SUCCEEDS AND MR. OSTEEN PROVIDES CAPITALIZATION**

57.     As a result of Defendant Yellin's inducements and representations, Mr. Osteen agreed to enter into series of agreements with Defendants.

58.     On July 28, 2020, Defendants formed UpLynkd LLC. *See* Certificate of Formation (attached as "Exhibit F").

59.     On September 10, 2020, the parties entered into the "Master Professional Service Agreement" ("Service Agreement") (attached as "Exhibit B").

60.     Pursuant to section 4.2 of the Service Agreement, Defendants coveted that it would provide and complete their services "in a good and workman like manner."

61.     On September 25, 2020, the parties entered into the "Operating Agreement of Uplynkd, LLC" ("Operating Agreement") (attached as "Exhibit C").

62.     On or about September 7, 2020, Mr. Osteen provided $50,000.00 to Defendants for the development of his software in accordance with the Operating Agreement.

63.     On November 19, 2020, the parties entered into the Amended and Restated Master Professional Services Agreement ("Amended Services Agreement") (attached as Exhibit D).

64.     Pursuant to section 4.2 of the Amended Service Agreement, Defendants restated that it would provide and complete their services "in a good and workman like manner."

65.     On or about November 25, 2020, Mr. Osteen provided another investment of $50,000.

66.     On January 23, 2021, the parties entered into the "Amended and Restated Operating Agreement of UpLynkd, LLC.  ("Amended Operating Agreement") (attached as "Exhibit E").

### MR. OSTEEN BECOMES ANOTHER VICTIM OF DEFENDANT YELLIN'S SCHEME

67.     Shortly after the purported development of Mr. Osteen's software began in or around September of 2020, Mr. Osteen, like Defendant Yellin's other victims,[1] began to experience the harms of Defendant Yellin's misrepresentations.

68.     Indeed, as the purported development progressed – despite Mr. Osteen having provided the details pertaining to the software, the Defendants having ample time to review and do their due diligence to determine the capability of developing the software, and determine the timeframe for completion – Defendant Yellin told Mr. Osteen that

---

[1] The other known victims of Defendant Yellin's scheme include Alam Ghafoor, Thomas Werney, Gallant Dill and Chase Cline.  *See Thomas Werney vs. Jared Yellin et al.*, Docket No.: 2:22-cv-05417 currently pending in the United States District Court of New Jersey; *Alam Ghafoor vs. Jared Yellin et al.*, Docket No.: 2:22-cv-04375 currently pending in the United States District Court of New Jersey; *Gallant Dill, et al., v. Yellin, et al.*, Docket No.: 22-CV-06116, currently pending in the United States District Court of New Jersey.

Defendants would not be able to develop anything in 90 days, contradicting prior representations

69.     Defendant Yellin told Mr. Osteen that the project was a lot bigger than they had expected – which was surprising since Defendants were provided with detailed plans and outlines for the project – but assured Mr. Osteen that the software would be developed soon.

70.     Instead of the development being complete within 90 days – as Defendant Yellin had promised and confirmed even after receiving the documents pertaining to the software from Mr. Osteen and having ample opportunity to review – Defendant Yellin now tells Mr. Osteen – two years later – that Defendants still have not completed (and likely cannot or will not complete) development of the software.

71.     Despite Defendants breaking their promise to Mr. Osteen in having the software developed in 90 days, Mr. Osteen continued to work with Defendants in reliance on the reassurances by Defendant Yellin that the software would be developed.

72.     Defendant Yellin's reassurances were merely stall tactics to continue to squeeze more money out of Mr. Osteen from his capital investment as Defendants clearly never had the capability to develop the software for the price or in the timeline as represented to Mr. Osteen.

73.     Defendants continued missing one promised deadline after another.

74.     Around January 21, 2021, Mr. Osteen held a conversation with Eric Nowoslawski, an employee of Defendants, and the project manager for the development of Plaintiff's software.

75.     Mr. Osteen expressed his concern to Eric Nowoslawski about the missed deadlines and was provided a Google Sheet on January 22, 2021 that provided a list of features and a completion timeframe of 16.75 weeks.

76.     Subsequently, Mr. Osteen held a conversation with an employee of Defendants – Seth Winters – who was his project manager.

77.     As part of that conversation, Mr. Osteen expressed his repeated concerns for the repeated delays, and failures to meet deadlines.

78.     Despite of all of the delays, the deadlines being missed – and Mr. Osteen's software being nowhere near complete – Defendant Yellin began pressing Mr. Osteen for more money.

79.     On January 22, 2021, Mr. Osteen received the following email from Eric Nowoslawski on which Defendant Yellin was copied:

80.     Part of the spreadsheet provided to Mr. Osteen outlined a list of features that would be complete within 16.75 weeks.

81.     Despite these assurances, those features were not completed within the timeframe provided by the Defendants.

**DEFENDANTS FAIL TO DEVELOP THE PROMISED SOFTWARE,
SQUANDER MR. OSTEEN'S CAPITAL,
AND DEFENDANT YELLIN DEMANDS EVEN MORE MONEY**

82.     As the delays continued to progress, Defendant Yellin continued to pressure Mr. Osteen repeatedly to get more investors and money for the development of the software.

83.     Relying on the assurances and promises made by Defendant Yellin, Mr. Osteen attempted to obtain more money to finance the development.

84.     As Mr. Osteen would later come to find out, Defendants were squandering the money he provided for the development of the website and incurring costs that were never previously agreed to.

85.     For example, pursuant to section 4.4 of the Operating Agreement and the Amended Operating Agreement, the parties agreed that no "Manager shall receive any compensation from the LLC solely by reason of performing the duties of Manager."

86.     Yet despite this covenant, Mr. Osteen was being charged for management fees by Defendants that were never previously agreed upon.

87.     Furthermore, Defendants were inflating their billing hours for the development work that was purportedly being performed.

**DEFENDANTS' FALSE PROMISES RUIN MR. OSTEEN'S
CREDIBILITY AND REPUTATION**

88.     As Defendants were racking up unjustifiable costs for the purported development of the software, Defendant Yellin forced Mr. Osteen to help Defendant CILA's marketing team to create a landing sales page and to start gathering potential client information.

89.     Mr. Osteen expressed his concern to Defendant Yellin about advertising the proprietary features of the software as there was no actual developed software and no timeframe for completion.

90.     Defendant Yellin assured Mr. Osteen that everything would be complete and ready for launch.

91.     Based on the representations and assurances by Defendant Yellin, Mr. Osteen assisted the marketing team in setting up the landing and promotion pages of the website for the software.

92.     Mr. Osteen also obtained some of the public adjuster industry's most prominent influencers to promote the software and received a lot of positive feedback for the work that he performed from those influencers.

93.      However, despite all the representations from Defendant Yellin, the software was still not developed and delivered as promised.

94.     Due to Defendant Yellin's failures to deliver on the promises made pertaining to the development of the software within the represented timeframes, Mr. Osteen's credibility and reputation among those influencers was severely damaged. For example, V.P., a non-party individual, had expressed substantial interest in using and promoting the ClaimGuru software but has since moved to another software because of the delays in development.

**DEFENDANTS UNILATERALLY CEASE DEVELOPMENT
OF MR. OSTEEN'S SOFTWARE**

95.     Despite Mr. Osteen bringing an investor that provided an additional $50,000.00 on or about March 30, 2021, for the development of Mr. Osteen's software – a net total of $150,000.00 invested – Defendants completely ceased the development of Mr. Osteen's software on September 13, 2022.

96.     Prior to Mr. Osteen agreeing to allow Defendants to develop his software and prior to Mr. Osteen providing the $100,000.00 capital for development of the software, Defendant Yellin made numerous assurances to Mr. Osteen that development would not stop until his software was fully developed.

97.     After two years of purported development, Mr. Osteen's software is nowhere near complete.

98.     Contrary to Defendant Yellin's assertions that Defendants could develop the software at a lower cost than the other developers that quoted Mr. Osteen for the project and within 90 days, after two years, Mr. Osteen providing $100,000.00 of his own money, and inducing an investor to provide an additional $50,000.00, Mr. Yellin demanded that Mr. Osteen "bring more money to the table" if he wanted the development of his software to proceed forward.

### DEFENDANT YELLIN'S FRAUDULENT MODUS OPERANDI, *I.E.*, HIS SIGNATURE

99.     Unbeknownst to Mr. Osteen at the time, the representations made by Defendant Yellin were nothing more than mere tactics used to induce Mr. Osteen into becoming just another one of his victims.

100.    Defendants never had the capability to develop Mr. Osteen's software within the 90-day timeframe and for the represented amount of $100,000.00.

15

101.    In fact, Defendant Yellin, individually and through various entities, had a method to inducing victims to extract money to fuel his own empire from would-be entrepreneurs. Yellin would pray on individuals with an idea and a desire to develop their idea into a business.

102.    Yellin would then make false representations to them pertaining to his experience in the area, the capabilities of his development team in bringing products to viability, and the cost of such development.

103.    Defendant Yellin would overcome their objections by saying anything he needed in order to get a piece of their business (*e.g.*, 90-120 days, at cost, $100,000, won't stop until its developed, we have the team, we will do everything, and we have done this before).

104.    Defendant Yellin would then induce them to commit capital to the development of the product or go raise it from other investors, friends or family. He would demand they raise more and more funds.

105.    After receiving the money for "development," Defendant Yellin would then syphon off these monies through fictitious invoices or passing along expenses for the operation or development of his other businesses (*i.e.*, CILA Labs, 10X Incubator, or Project 10K).

106.    Defendants would then prolong the development process and create excuses for the delay.

107.    After prolonging the development process – and knowing fully well that the promised product could not be delivered – Defendant Yellin would present his victims with sub-optimal or unviable product causing the relationship to become strained.

108.    Mr. Osteen, like the other founders who are sharing their stories, will no longer remain silent as the Defendants shamefully stand on the shoulders of good people to reach

for the stars. These are human beings with dreams that Defendants crushed; not expendable

fuel sources to achieve an impossible moonshot.

## DEFENDANT YELLIN'S SCHEME CONFIRMED BY FORMER EMPLOYEES AND FRIENDS OF DFENDANT YELLIN AND CILA LABS

109.    Notably, it is not just Mr. Osteen and other founders that have brought Defendants

wrongful actions to light, it is also former employees of CILA.

110.    Specifically, Eric Nowoslawski provided a declaration, under penalty of perjury,

discussing some of the disturbing business practices of Yellin and CILA.

111.    Mr. Nowoslawski declared,

> Here again, I found CILA Labs to over promise in terms of their capabilities.
> CILA Labs told founders they could produce code to create an application
> or software through CILA Labs team "at cost." At times, I found CILA Labs
> and Yellin would actually chose much more expensive options – such as
> using custom code where no code tools were available. Even if that was
> okay, I routinely experienced that the coding team, which were employees
> of another company, CILA Labs India, would produce sub-optimal
> deliverables like applications or software." *See* Declaration of Eric
> Nowoslawski at Par. 22-24.

112.    Mr. Nowoslawski further declared:

> Additionally, I was routinely told by Jared Yellin, among others, to engage
> in troubling billing practices of clients. For example, we were told to
> overestimate the time a particular project would take to complete. I was also
> told to "find" more things to do to bill my time even if I completed an
> assignment more efficiently and effectively then we budgeted. For example,
> if a particular step in a project was budgeted for 16 hours, when I actually
> only took 4 hours, Yellin would attempt to have me inflate my hours by
> finding other things to bill my time for to get to the 16 hours. Yellin would
> also regularly inquire why we should put down 4 hours if the job was
> budgeted for more and instruct me to put in extra research into influencers
> and the industry or do other extra work, which would cause me to increase
> my hours on a particular project. *See id.* at Par. 28 and 29.

113.    Mr. Nowoslawski still further declared:

> I voiced my concerns on multiple occasions about the language being used
> to promote CILA Labs and later the 10X Incubator, especially to potential

investors. Yellin would also consistently make false statements and promises to the clients. For example, Jared would make claims that he had a team of 200 software engineers in India – we did not. By way of further example, he would claim we received 12,000 submissions for pitches, when in fact that number was far higher than actual number of submission. He would claim that CILA Labs and later 10X Incubator was worth $1 billion. He attempted to engage in fund raising activities using this valuation. These statements were those that I considered false and made me uncomfortable. I drew the line when I was asked by Yellin to (1) go out and sell 10X Tech Insider and (2) raise investor money for the incubator at $1 billion valuation. At the start-up phase, Yellin was advising the founders to go to friends and family and raise hundreds of thousands of dollars to "fund" the start-up. He would over promise what he could accomplish, his ability to make the founders, and their ideas successful. For example, he would routinely say he had an outcome to bring 10,000 businesses to a successful launch and exit, he believed 100% of his co-founders would have successful exits, and that he had substantial industry connections that could catapult the product or service into the mainstream. *See id*. at Par. 32 – 37.

114. Eric Nowolawski was very close to Yellin prior to his resignation from CILA Labs.

Indeed, his picture is <u>still</u> on the Project10K website under the section "Changemakers."



115. In addition to Mr. Nowoslawski, a Product Manager, Ken Steinberg, shared by way of declaration, what he witnesses during his time with CILA Labs. Mr. Steinberg was the Product Manager for Mr. Osteen's software, among others.

116.   Mr. Steinberg declared,

With respect to developing the products, CILA was making unrealistic promises on the time it would take to develop the products and the costs that would be associated with developing the product, such as 90-120 days to fully develop a product. This became quickly apparent to me, especially considering the scope and complexity of the projects. During my time as Product Manager, it became clear to me very quickly that Jared Yellin and the marketing team did not understand the complexity behind the projects that it was promising to develop, and the time and costs that it would realistically take to develop the product. This issue was at the executive level of CILA. CILA was proverbially "writing checks it could not cash" by making promises to the founders that it could not deliver on under the promised conditions for the promises prices. *See* Declaration of Ken Steinberg at Par. 15 – 18.

117.   Mr. Steinberg further declared,

It also became readily apparent that the company would have to go back to the founders to obtain more money to develop the promised products as the original price quotes they were likely giving to founders were substantially lower than the actual costs it would take to develop the product. The realization that CILA was not going to be able to deliver on its promises to the founders became even more clear given that I was not able to observe a clear "go to market" strategy for these companies. For example, CILA had hired a twenty-year-old with no prior marketing experience or background to be in charge of their "go-to-market" strategy. Upon information and belief, the only marketing steps I have observed that were taken by this individual was to send messages on the messaging application called "Slack" and sending tweets on Twitter. I addressed this matter with Jared Yellin and the leadership at CILA – which went entirely disregarded – and CILA continued to operate without a market strategy and took a "deal with it as it comes" approach. *See id*. at Par. 19 – 22.

118.   Mr. Steinberg still further declared,

Additionally, the 90 to 120-day timeline for development of a minimum viable product ("MVP") was completely unrealistic. I observed Mani the CTO tell Jared Yellin at meetings that this timeline was unrealistic. Further, I observed Mani tell Jared Yellin that the CILA engineers would not be able to develop the products under the conditions that were promised. From my observations, it was clear that the executives at CILA had no knowledge as to the actual time and expense it takes to develop the promised software for the founders. Considering the decisions and promises that were being made by Jared Yellin to the founders, it was apparent to me that not only did Jared Yellin not know how to develop software. It was also apparent to me that he did not have

knowledge of what it took to bring a product to the market. *See id*. Par. 23 – 25.

119.    In addition to Mr. Nowoslawski and Mr. Steinberg sharing their observations about the business practices of Defendant Yellin and CILA Labs, a person who described Yellin as a "personal friend", Steve Gallegos, also signed declaration providing further support to the experience of Mr. Osteen (and other founders).

120.    Mr. Gallegos is a former U.S. Marine Sergeant, law enforcement officer, and an attorney licensed to practice in the State of California.

121.    Mr. Gallegos made introductions to Defendant Yellin of some of the founders, including Mr. Osteen.

122.    Mr. Gallegos declared,

> When I originated potential clients for Jared Yellin and CILA, I and or my wife would participate in the phone calls between the potential client and Jared Yellin. By way of example, I sat in on the initial phone calls between Jared Yellin and Josh Osteen, as well as the initial conversation between Jared Yellin and Alam Ghafoor. During his "pitch," Jared Yellin told potential clients that he had large team of engineers in his India based company – known to me as CILA Labs Private Limited – that they were experienced and capable in developing the software that the potential client sought to create; that he and his company would develop a minimum viable product ("MVP"); and bring it to market within 90-120 days; that he and his company would provide all of the resources and support to market and sell the product or service; and that they would create an exit strategy. Additionally, Jared Yellin would assure the potential clients that he had experience in developing the type of product that they wanted to bring to market. See Declaration of Steve Gallegos at Par. 26 – 29.

123.    Mr. Gallegos further declared,

> Jared Yellin would also tell each of the potential clients of his own story from years prior where he hired a software developer to create his Synduit company for an agreed upon price of around $750,000 U.S. only to (allegedly), later receive less than what he was promised together with an invoice of over 1.5 million dollars U.S. Jared Yellin told the clients and emphasized that because of his own experience, he decided to make it his mission to level the playing field for any person with a great idea by billing them only the pricing that CILA paid to its Indian based employees (a price substantially lower than U.S. based

companies), subject to a small percentage increase for CILA's operating costs. He said he would be completely transparent with each founder, and that he would be a true partner with them to develop and bring their software solution to the marketplace in 90-120 days. During these pitches, Jared Yellin would also tell the potential client that they would need to bring in approximately $150,000.00 and assured these potential clients that that money would be returned to them once the company became revenue positive. Despite these representations by Jared Yellin to potential clients, to my knowledge not one of the clients that I referred to Jared Yellin has seen recurring revenues generated from software or marketing strategy developed by Jared Yellin's or CILA Labs. *See id.* at Par. 30 – 33.

124.    Mr. Gallegos still further declared,

To my knowledge, Jared Yellin did not keep his promises to the clients that I brought in. that his company would develop an MVP and bring it to market within 90-120 days. I would later come to find out from one of the clients that I introduced to CILA, that there were numerous other clients of CILA who were experiencing the exact same issues with CILA that they were going through, e.g., CILA overcharging, not providing an accounting, not providing transparency, failing to develop an MVP and bring it to market within 90-120 days. As a result of Jared Yellin failing to keep his promises to his clients, the clients that I brought in, and his failure to uphold his promises under our agreement, my wife and I terminated our personal and business relationship with Jared Yellin. *See* Par. 34 – 36.

125.    These three brave individuals provided their declarations despite Defendant Yellin having a history of abusing the litigation process to silence dissenters from telling the truth about him. There are many, many others who will answer to a subpoena and testify about their experience with Defendants' misconduct.

### AFTER TWO YEARS OF PURPORTED DEVELOPMENT, MR. OSTEEN IS LEFT WITH NOTHING BUT PURPORTED INVOICES

126.    Defendants could not and did not develop the promised software after 90 days of purported development.

127.    Defendants could not and did not develop the promised software after a year of purported development.

128.    Defendants could not and did not develop the promised software after two years of purported development.

129.    During the two years of purported development that failed to result in a functioning software, Mr. Osteen's software idea lost traction due to other competition that arose within the two-year timeframe and after the promised 90-day period for developing the software.

130.    After suffering two years of empty promises, losing $100,000.00, having an investor colleague lose $50,000.00, having his reputation and credibility ruined due to Defendants deceitful actions, and having no working software to show for it, Mr. Osteen, on behalf of SystemsLynK, LLC, requested to review the records of Defendant CILA Labs and Uplynkd, LLC.

131.    In response, Mr. Osteen received a letter from an attorney for Defendant CILA Labs on October 12, 2022 stating in its opening line: "as a matter of law, [CILA] is under no obligation to produce the voluminous records Systemlynx has requested." And on October 13, 2022, Mr. Osteen received a follow-up invoice for services demanding payment for another $17,553.47.

132.    Since then, Mr. Osteen has demanded a refund for all fees paid to CILA Labs pursuant to Paragraph of 3.4.4 of its Master Professional Services Agreement. No such refund has been provided.

3.4.4   If a Deliverable resubmitted to UpLynkd pursuant to Section 3.4.3, still does not meet the acceptance criteria in all material respects, or does not meet UpLynkd's reasonable satisfaction, as applicable under Section 3.4.2, CILA will have ten (10) days (or such longer period that UpLynkd agrees to in writing) to finalize the deliverable.  If CILA does not deliver an acceptable Deliverable within the applicable cure period (including as it may be extended), then UpLynkd may, at its option and without obligation or liability of any kind: (a) terminate the applicable Statement of Work, in whole or in part, and receive a prompt refund of all fees for the portion of the Statement of Work so terminated and any other Deliverables that are unusable as a result of such rejection; or (b) without prejudice to such termination right of UpLynkd, extend the time for CILA to correct the affected Deliverable.

133.    For many months, especially the months of October, November and December 2022, Plaintiffs attempted to resolve the issues that are serving as a basis for the Verified Complaint with Defendants, to no avail.

134.    On or about November 30, 2022 (and throughout the month of December), Plaintiffs made specific requests to bring about a global resolution to this matter. A demand was made on Defendants by way of Defendant Yellin which addressed, *inter alia*, Defendants' failure to develop an MVP of the software within 90-120 days, as well as the costs of the purported development that greatly exceeded previous representations, and lack of access to the records pertaining to the development of the software.

135.    Throughout December 2022, the parties engaged in numerous discussions that ultimately led to Defendants rejected Plaintiffs demand to resolve the matter.

136.    This is not the response one would expect from a co-founder and fiduciary.

137.    Mr. Osteen is a hardworking individual that entrusted Defendant Yellin and the Defendants with time, money, and reputation, in order to have his software developed and in return Defendant Yellin left him with a bill of goods.

138.    Mr. Osteen seeks justice for his breaches of contract and fiduciary duties, his dishonest misconduct, and fraudulent misrepresentations.

139.     To this day, he has still not received the work product he was promises, and Plaintiffs were forced to bring this action as a result of Defendants rejecting the reasonable demand made by Plaintiffs.

140.     And the only place he will receive that justice is before this Court.

## CAUSES OF ACTION

### COUNT I
### FRAUD

**PLAINTIFFS**
**against**
**AS TO DEFENDANT YELLIN AND CILA LABS, LLC**

141.     Plaintiff repeats and restates the allegations in the preceding paragraphs of the Complaint as if fully set forth at length herein.

142.     Mr. Osteen entered into business and agreements with Defendants based on false and material misrepresentations made by Defendant Yellin and Defendant CILA Labs, LLC.

143.     Defendant Yellin's assured Mr. Osteen that he possessed a large staff of developers that would be dedicated to Mr. Osteen's project, that he would be able to develop Mr. Osteen's software faster than other developers and that it would be "legitimately at cost."

144.     Defendant Yellin assured Mr. Osteen, after he and Defendants reviewed the documents provided by Mr. Osteen pertaining to the software that Defendants could develop the software in 90-120 days and for $100,000.00.

145.     Defendant Yellin assured Mr. Osteen that his team would develop the software and would be able to have an MVP within 90-120 days to start generating revenues.

24

146.   In addition, according to notes taken during a call in July 2020 with Steve Gallegos, his wife, Alethia Gallegos, and Jared Yellin, Jared made the following additional statements:

    a.   "When we say yes… it is because we can contribute more than just development"

    b.   "This is "smart" money. CILA Labs does so much more than just fund the development the software."

    c.   Speed of innovation: "Seeing results sooner, rather than months and years later, is encouraging and exciting."

    d.   "We have a track record of success. We've done this before. We know how to work with your development team and save years' worth of headaches that can derail projects."

    e.   We market the finished product: "Helping to get market traction and new customers quickly is a key distinction that none of the other companies are offering that I know of."

147.   Defendant Yellin made these statements in order to induce Mr. Osteen to agree to use CILA Labs and share his idea with them.

148.   Defendant Yellin made these statements in order to induce Mr. Osteen to capital contributions for the benefit of Defendants.

149.   Defendants knew that they could not develop the software within the 90-120 day timeframe provided by Defendants.

150.   Defendants knew that they could not develop Mr. Osteen's software for $100,000.00 or at cost.

151.    Defendants knew that their team could not develop the software Mr. Osteen required, yet they continued to make representations about their ability to do so as outlined above.

152.    The costs of the purported development significantly exceeded the $100,000 that Defendant Yellin represented to Mr. Osteen as being needed to develop the software.

153.    Defendant Yellin and the other Defendants knew they would not refund monies upon request if they fail to deliver the services set forth in the Master Services Agreement.

154.    Based on Defendant Yellin's false representations pertaining to Defendants ability to develop the Mr. Osteen's software, Mr. Osteen provided $100,000.00 in capital and an additional $50,000.00, via an investor because of Defendant Yellin's misrepresentations.

155.    Defendants misrepresented to Mr. Osteen the costs of development and how Mr. Osteen's capital contributions were spent.

156.    Mr. Osteen reasonably relied on the representations made by Defendants.

157.    After wasting $150,000.00 on the purported development of the Mr. Osteen's software, Defendants failed to develop the promised software and have completely abandoned their efforts.

158.    As a direct and proximate result of Defendants' false representations, Mr. Osteen suffered substantial harm.

## COUNT II
## BREACH OF FIDUCIARY DUTY

**SYSTEMSLYNK, LLC, individually and as member for UPLYNKD, LLC, AGAINST DEFENDANT CILA LABS, LLC**

159.    Plaintiff repeats and restates the allegations in the preceding paragraphs of the Complaint as if fully set forth at length herein.

160.   As the Manager of UpLynkd, LLC, Defendants CILA Labs, individually, owed a fiduciary duty to UpLynkd, LLC and SystemsLynk, LLC.

161.   These fiduciary duties included, among other things, the duties of care, loyalty, candor, and disclosure.

162.   As discussed, more comprehensively above, the Defendants breached these duties in a number of ways.

163.   By way of illustration, Defendants breached these duties by making materially false representations and omitting material information to the detriment of the Mr. Osteen – only some of which are included in this Complaint for illustration purposes. These statements, made by Defendant Yellin and Defendant CILA Labs, to Mr. Osteen, were in breach of Defendants duty of disclosure.

164.   For example, Defendant Yellin, individually and on behalf of CILA Labs, assured Osteen that Defendants already had a full team of experienced developers who would be able to develop and launch his software at cost.

165.   Defendant Yellin, individually and on behalf of CILA Labs, assured Mr. Osteen that he would develop his software in 90-120 days.

166.   Defendant Yellin, individually and on behalf of CILA Labs, assured that the software and development costs would be developed for $100,000.00.

167.   Defendant Yellin, individually and on behalf of CILA Labs, represented to Mr. Osteen that his capital would be used to fund the development of his software.

168.   Defendant Yellin, individually and on behalf of CILA Labs, caused UpLynkd, LLC to enter into self-interested transactions with other entities owned by, controlled by, or with

a beneficial interest to Defendant Yellin and CILA Labs, such as CILA India and Project 10k.

169.    These representations were false and done for the benefit of Defendants so that they could pilfer and divert Mr. Osteen's capital under the guise of an unsuccessful business venture.

170.    By way of further illustration, Defendants allowed their self-interest to prevail over the interests of UpLynkd, LLC by spending the capital provided by Plaintiffs and its investor to the benefit of Defendants while knowing fully well that they could not develop the software as promised.

171.    By way of further illustration, Defendants inflated the hours spent on purported development and overbilled UpLynkd, LLC for the purported development.

172.    By way of further illustration, according to the document entitled "AMENDED AND RESTATED MASTER PROFESSIONAL SERVICES AGREEMENT" signed by Jared Yellin on behalf of CILA India on the one hand and Josh Osteen on behalf of UpLynkd, CILA India was to maintain a professional ("aka Errors and Omissions") policy of insurance with $1,000,000 of coverage.

**EXHIBIT 2**
**INSURANCE**

**Form of Insurance / Minimum Limits of Insurance**

CILA will maintain at least the following:

(a)(1) workers compensation coverage, as required by law, and (2) employers liability coverage at $1,000,000 per occurrence (including BI/disease).

(b) professional liability (aka Errors & Omissions liability), endorsed to cover services provided by subcontractors if any at $1,000,000 per occurrence and aggregate.

173.    Upon information and belief, Mr. Osteen's complaints by UpLynkd related to services purportedly provided by CILA India was never submitted to the carrier providing

these services, Defendants have not communicated this fact to Plaintiffs, or the policy of insurance was never obtained.

174.    In any event, Plaintiffs have been harmed by the fact that they cannot now access coverage for the damages caused by, among others, CILA India and such access may now be foreclosed for violation of non-cooperation clauses that generally are included in contracts for insurance.

175.    Jared Yellin, individually and on behalf of CILA Labs, used the ClaimGuru business to attract investment opportunities to other CILA Labs and 10X Incubator business operations in violation of his fiduciary duty of loyalty.

176.    Yellin used Plaintiff Entities' rights to ClaimGuru – with an unexplained business valuation of $5,000,000 – to attract individuals to purchase subscription agreements for $5,000 to an entity owned by 10X Incubator – 10X Tech Angels – in order to get revenue from people subscribing and also investing in entities unrelated to Plaintiffs' business.

177.    This had a number of adverse effects including: (a) turning away would be investors by creating a barrier to entry; (b) resulting in investors who wanted to invest in the ClaimGuru to first "pay a toll" to do so to an entity that benefited CILA Labs and another individual, Grant Cardon, and not Plaintiffs, who received no beneficial interest from these subscriptions; (c) causing subscribers to invest with CILA Labs directly and/or investing with another entity owned or controlled by 10X Incubator, Project 10K, or CILA Labs other than Plaintiff Entities. This resulted in Plaintiffs not receiving the benefit of CILA Labs promises – support in raising investor funds – as well as the loss of investor opportunities to benefit the selfish interests of Defendants Yellin, CILA Labs, and 10X Tech Angels, LLC, which was owned by 10X Incubator.

178.    In addition to the above violations, Defendants CILA Labs, as the Managing Member, has failed to enforce the terms of the CILA Incubator agreement for numerous violations of its professional services agreement. Plaintiffs alleged that Defendants are in violation of Paragraph 3.1, 3.2, 3.4, 4.2, 4.4, 4.5, 5.1, 5.3, 7.1 – 7.3, 8.1, 8.3, 9.2, 12.1, and 12.4. These violations are intended for illustration – and not limitation – purposes only.

179.    As a direct and proximate result of Defendants' breach, Plaintiffs suffered substantial harm.

**COUNT III**
**BREACH OF CONTRACT**

**SYSTEMSLYNK, LLC, individually and as member for UPLYNKD, LLC,**
*against*
**DEFENDANTS CILA LABS, LLC**

180.    Plaintiff repeats and restates the allegations in the preceding paragraphs of the Complaint as if fully set forth at length herein.

181.    Plaintiff and Defendant Yellin entered into the Operating Agreement and Amended Operating Agreement which are legally binding contracts. *See* Exhibit B and Exhibit C.

182.    Pursuant to Operating Agreement and Amended Operating Agreement, Plaintiffs were required to provide $100,000.00 capital contribution.  Plaintiffs provided the required capital contribution in accordance with these agreements.

183.    Pursuant to section 4.4 of the Operating Agreement and Amended Operating Agreement, the parties agreed that no "shall receive any compensation from the LLC solely by reason of performing the duties of Manager."

184.    Defendant breached the contract by charging and requiring Plaintiffs pay fees for Defendants' performing managerial duties in violation of the Operating Agreement and Amended Operating Agreement.

185.    Furthermore, the Operating Agreement includes language prohibiting the transfer of CILA's membership interest without consent of the other members.

186.    Notwithstanding, upon information and belief, CILA has indeed transferred its ownership interest to Project 10k, either actually or effectively through CILA's acquisition by Project 10k (which at the time was called 10X Incubator.

187.    As a direct and proximate result of Defendants' breach, Plaintiffs suffered substantial damages.

**COUNT IV**
**BREACH OF CONTRACT**

**SYSTEMSLYNK, LLC, individually and as member for UPLYNKD, LLC**
*against*
**DEFENDANTS CILA LABS, CILA INCUBATOR PRIVATE LIMITED, and PROJECT 10K**

188.    Plaintiff repeats and restates the allegations in the preceding paragraphs of the Complaint as if fully set forth at length herein.

189.    Plaintiffs and Defendants entered in a Service Agreement and an Amended Service Agreement.  See Exhibits D – E.

190.    These service agreements are valid contracts.

191.    Defendants CILA Labs, CILA India, and Project 10k all billed for purported services provided. Upon information and belief, these entities all operate as alter egos of one another. Indeed, on Project 10k's website it includes language like: "July 2020: CILA Labs (now Project 10K) was born…"; "December 2020: PROJECT 10K ONBOARDING… Project 10K onboards its first 7 entrepreneurs since its inception and begins to solidify the team, processes, and structure to make the moonshot a reality

shot…"; and "January 2022: REBRAND… CILA Labs begins the rebrand of the company to Project 10K."

192.    Pursuant to section 4.2 of the service agreement, Defendants coveted that they will "provide and complete" the development of Mr. Osteen's software in "a good and workman like manner."

193.    Prior to entering into this Agreement, Plaintiffs provide substantial engineering notes, had multiple telephone calls discussing the features of the software, and all participating parties were in agreement as to the scope of the project and its cost.

194.    Plaintiffs infused capital, time and energy into the project.

195.    However, no software has been developed. Defendants have failed to deliver on the promises of this project notwithstanding the fact that they have been paid for these services.

196.    Defendants have since abandoned their efforts to complete the development of Mr. Osteen's software in breach of the Service Agreements.

197.    Plaintiffs performed their duties pursuant to the Service Agreements.  Defendants have breached.

198.    Plaintiffs requested a refund pursuant to the Master Services Agreement paragraph 3.4.4 and Defendants have failed to provide this refund.

> 3.4.4   If a Deliverable resubmitted to UpLynkd pursuant to Section 3.4.3, still does not meet the acceptance criteria in all material respects, or does not meet UpLynkd's reasonable satisfaction, as applicable under Section 3.4.2, CILA will have ten (10) days (or such longer period that UpLynkd agrees to in writing) to finalize the deliverable.  If CILA does not deliver an acceptable Deliverable within the applicable cure period (including as it may be extended), then UpLynkd may, at its option and without obligation or liability of any kind: (a) terminate the applicable Statement of Work, in whole or in part, and receive a prompt refund of all fees for the portion of the Statement of Work so terminated and any other Deliverables that are unusable as a result of such rejection; or (b) without prejudice to such termination right of UpLynkd, extend the time for CILA to correct the affected Deliverable.

199.    In addition, Plaintiffs allege that Defendants are in violation of Paragraph 3.1, 3.2, 3.4, 4.2, 4.4, 4.5, 5.1, 5.3, 7.1 – 7.3, 8.1, 8.3, 9.2, 12.1, and 12.4. These violations are intended for illustration – and not limitation – purposes only.

200.    As a direct and proximate result of Defendants' breach, Plaintiffs suffered substantial damages.

**COUNT V**
**BREACH OF IMPLIED COVENANT OF**
**GOOD FAITH AND FAIR DEALING**

**SYSTEMSLYNK, LLC, individually and as member for UPLYNKD, LLC**
*against*
**DEFENDANTS CILA LABS, LLC AND DEFENDANT YELLIN**

201.    Plaintiffs repeat and restate the allegations in the preceding paragraphs of the Complaint as if fully set forth at length herein.

202.    Plaintiffs and Defendants CILA Labs, CILA entered into a variety of agreements including the Amended and Restated Operating Agreement of UpLynkd, LLC, and Amended Services Agreement which are legally binding contracts.

203.    These contracts were entered into by the parties for the purposes of Defendants developing the Plaintiffs' software.

204.    Plaintiffs performed their obligation under these agreements.

205.    As exemplified above, Defendants failed to perform their obligations under these agreements and violated the implied covenant of good faith and fair dealing by frustrating the reasonable expectation and purposes of the contracting parties.

206.    As a direct and proximate result of Defendants' breach, Plaintiff suffered substantial harm.

**COUNT VI**
**AIDING AND ABETTING**

**BREACH OF FIDUCIARY DUTY**

**SYSTEMSLYNK, LLC, individually and as member for UPLYNKD, LLC**
*against*
**DEFENDANTS CILA LABS, LLC, DEFENDANT YELLIN, CILA PRIVATE
LIMITED, PROJECT 10K, and 10X TECH ANGELS, LLC**

207.    Plaintiffs repeat and restate the allegations in the preceding paragraphs of the Complaint as if fully set forth at length herein.

208.    As stated above in Count II, Defendant CILA Labs stood in a fiduciary relationship with the UpLynkd, LLC and Plaintiffs.

209.    These fiduciary duties included, among other things, the duties of care, loyalty, candor, and disclosure.

210.    As discussed, more comprehensively in Count II, the Defendant breached these duties.

211.    While Defendant CILA Labs was engaging in that unlawful behavior, Defendants Yellin, CILA Private Limited, and Project 10k facilitated, aided, and supported CILA Labs in the unlawful conduct.

212.    Specifically, Defendants Yellin, CILA India, and Project 10k knew of the unlawful scheme that Defendant CILA Labs was perpetrating on the Plaintiffs, and assisted Defendant CILA Labs in perpetuating the fraud as described in detail above.

213.    Despite their knowledge they, as discussed more comprehensively above, (a) made statements to keep the fraudulent ruse going surrounding the development of Plaintiffs' software application, and (b) created fraudulent invoices, among other activities, that assisted Defendant CILA Labs in its breaches of its fiduciary duties.

214.    As it relates to 10X Tech Angels, LLC, Jared Yellin used ClaimGuru investment opportunities – with an unexplained business valuation – to attract individuals to purchase

34

subscription agreements for $5,000 in order to invest in entities related to Plaintiffs business.

215.   This had a number of adverse effects including: (a) turning away would be investors by creating a barrier to entry; (b) resulting in investors who wanted to invest in the ClaimGuru to first "pay a toll" to do so to an entity that benefited CILA Labs and another individual, Grant Cardon, and not Plaintiffs, who received no beneficial interest from these subscriptions; (c) causing subscribers to invest with CILA Labs directly and/or investing with another entity owned or controlled by 10X Incubator, Project 10K, or CILA Labs other than Plaintiff Entities. This resulted in Plaintiffs not receiving the benefit of CILA Labs promises – support in raising investor funds – as well as the loss of investor opportunities to benefit the selfish interests of Defendants Yellin, CILA Labs, and 10X Tech Angels, LLC, which was owned by 10X Incubator.

216.   As a direct and proximate result of Defendants' breach, Plaintiff suffered substantial harm.

## COUNT VII
## NEGLIGENT MISREPRESENTATION

### ALL PLAINTIFFS
### *against*
### DEFENDANT YELLIN AND CILA LABS, LLC

217.   Plaintiff repeats and restates the allegations in the preceding paragraphs of the Complaint as if fully set forth at length herein.

218.   Mr. Osteen entered into business, and entered into agreements, with Defendants based on negligent misrepresentations made by Defendant Yellin and Defendant CILA Labs, LLC.

219.    As illustrated above, Defendant Yellin assured Mr. Osteen, that Defendants already had a full team of experienced developers who would be able to develop and launch the Mr. Osteen's software.

220.    Defendant Yellin, individually and on behalf of CILA Labs, assured Mr. Osteen that he would get his software developed in 90-120days.

221.    Defendant Yellin, individually and on behalf of CILA Labs, assured Mr. Osteen that the software and development costs would be $100,000.00.

222.    Defendant Yellin, individually and on behalf of CILA Labs, convinced Mr. Osteen that he had previously created successful software companies.

223.    Defendant Yellin, individually and on behalf of CILA Labs, represented to Mr. Osteen that his capital would be used to fund the development of the software.

224.    The Costs of developing the software greatly exceeded the previous representations made by Defendant Yellin.

225.    Mr. Osteen reasonably relied on the representations made by Defendant Yellin, individually and on behalf of CILA Labs.

226.    Defendants have failed to develop Mr. Osteen's software in 90-120 days and have abandoned it after purportedly developing it for two years, greatly exceeding the time represented to Mr. Osteen that it would take to develop the website.

227.    Defendants had spent over $100,000.00 on purportedly developing the software and the software is nowhere near being complete, and Defendants abandoned all efforts to complete the development of the website despite assurances made that the work would not stop until it was developed.

228.    As a direct and proximate result of Defendants' breach, Plaintiff suffered substantial harm.

**COUNT VII**
**BREACH OF CONTRACT**

**SYSTEMSLYNK, LLC, individually and as a member for UPLYNKD, LLC**
*against*
**DEFENDANT CILA INDIA**

229.    Plaintiff repeats and restates the allegations in the preceding paragraphs of the Complaint as if fully set forth at length herein.

230.    According to the document entitled "AMENDED AND RESTATED MASTER PROFESSIONAL SERVICES AGREEMENT" signed by Jared Yellin on behalf of CILA India on the one hand and Josh Osteen on behalf of UpLynkd, CILA India was to maintain a professional ("aka Errors and Omissions") policy of insurance with $1,000,000 of coverage.



**EXHIBIT 2**
**INSURANCE**

Form of Insurance / Minimum Limits of Insurance

CILA will maintain at least the following:

(a)(1) workers compensation coverage, as required by law, and (2) employers liability coverage at $1,000,000 per occurrence (including BI/disease).

(b) professional liability (aka Errors & Omissions liability), endorsed to cover services provided by subcontractors if any at $1,000,000 per occurrence and aggregate.

231.    Upon information and belief, Mr. Osteen's complaints by UpLynkd related to services purportedly provided by CILA India was never submitted to the carrier providing these services – or Defendants have not communicated this fact to Plaintiffs.

232.    In any event, Plaintiffs have been harmed by the fact that they cannot access coverage for the damages caused by, among others, CILA India and such access may now

be foreclosed for violation of non-cooperation clauses that generally are included in contracts for insurance.

**WHEREFORE**, Plaintiffs demand for the aforementioned causes of action the following:

a) Judgment granting all of Plaintiffs' claims in their entirety and awarding damages including but not limited to repayment of financial loss, disgorgement of business opportunities, compensatory and special damages, interest, and punitive damages in an amount as the proof at trial may warrant.

b) Awarding Plaintiffs replevin against Defendants and immediate possession of Plaintiff's confidential and proprietary information and documents.

c) Awarding Plaintiffs a constructive trust against such assets to have been guilty of conversion in an amount sufficient to assure that Plaintiff be able to obtain compensation in full for any amounts taken.

d) Awarding Plaintiffs interest in an amount as the proof at a trial may warrant.

e) Awarding Plaintiffs monetary damages.

f) Awarding Plaintiffs compensatory and special damages.

g) Awarding Plaintiffs punitive damages against Defendants for their intentional and malicious actions in an amount as the proof at a trial may warrant.

h) Awarding Plaintiffs attorneys' fees and costs incurred in prosecuting this action in an amount to be determined at trial.

i) Awarding Plaintiffs any other damages that it is entitled to under Delaware Law or Statute;

j) Together with such other and further relief as the Court deems just and proper.

**CALLAGY LAW, P.C.**
Dated: January 30, 2023

By:  Michael J. Smikun
     Michael J. Smikun, Esq.
     Mack Cali Centre II
     650 From Road – Suite 565
     Paramus, New Jersey 07652
     Telephone: (201) 261-1700
     Facsimile: (201) 549-8408
     E-mail: msmikun@Callagylaw.com
     *Attorneys for Plaintiff*

**Verification**

I, Joshua Osteen, declare pursuant to 28 U.S.C. §1746, under penalty of perjury that the following is true and correct as follows:

1. I am a Plaintiff in the present case and a citizen of the United States of America. I am also the Manager of SYSTEMSLYNK, LLC, which is a member of UPLYNKD, LLC.

2. As such, I have personal knowledge of the facts set forth in the Verified Complaint, and if called on to testify I would competently testify to the matters stated therein.

3. I verify that the factual statements in the Verified Complaint are true to the best of my knowledge.

Executed on January 30, 2023

*Joshua Osteen*
Joshua Osteen